UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

Samuel E. Gerald,

                 Plaintiff,

     -against-

D.C.V. Holdings, Inc., Dominick Vitucci Truck Sales
d/b/a Dom's Truck Sales, Dominick Vitucci, Sr., and
Dominick Vitucci, Jr.

                 Defendants.
-------------------------------------------------------------------x

Civil Action No:

<u>COMPLAINT</u>

Trial by Jury Demanded

**PLAINTIFF SAMUEL GERALD** (hereinafter referred to as "Plaintiff"), by his attorneys, Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, as and for his Complaint, alleges, upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

1.     This is an action to remedy unlawful race discrimination, race-based hostile environment, unwelcome racial harassment, and retaliation in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), New York State Human Rights Law ("NYSHRL"), 42 USC §1981 and New York City Human Rights Law ("NYCHRL").

2.     Plaintiff seeks declaratory relief, monetary damages and punitive damages.

## **PARTIES**

3.     Plaintiff Samuel Gerald is a fifty-year-old Black male, and a self-taught, expertly skilled worker in heavy machinery and repair and maintenance of heavy trucks.

4.     Plaintiff, at all relevant times herein, resided in the State of New York, Kings County, Brooklyn, New York. Since the age of nine, and at all times relevant herein, Plaintiff was an employee of Defendant Dom's Truck Sales.

5.      Defendant D.C.V. Holdings, Inc. (hereinafter ("Defendant DCV Holdings") is a corporation organized and existing under the laws of the State of New York, authorized to do business in the State of New York.

6.      Defendant Dominick Vitucci Truck Sales d/b/a Dom's Truck Sales (hereinafter "Defendant Dom's"), is a corporation organized and existing under the laws of the State of New York, authorized to do business in the State of New York. Upon information and belief, Defendant Dom's is located at 427 Euclid Avenue in Brooklyn, NY

7.      Defendant Dominick Vitucci, Sr. (hereinafter "Defendant Vitucci Sr."), is a white male. Upon information and belief, he does business at 427 Euclid Avenue, Brooklyn, NY, 11208. Upon information and belief, at all relevant times, Defendant Vitucci Sr. was Plaintiff's employer, and controlled the terms and conditions of his employment.

8.      Defendant Dominick Vitucci, Jr. (hereinafter "Defendant Vitucci Jr."), is a white male and the son of Defendant Vitucci Sr. Upon information and belief, at all relevant times, Defendants Vitucci Jr. was Plaintiff's employer, and controlled the terms and conditions of his employment.

9.      Upon information and belief, Defendants maintain their principal place of business in Brooklyn, New York, and all relevant events happened in Brooklyn, New York.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, 1343, 1981, 3729 and other relevant federal statutes. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

Samuel E. Gerald,                                                  Civil Action No:

                              Plaintiff,

                                                                   COMPLAINT

        -against-
                                                                   Trial by Jury Demanded

D.C.V. Holdings, Inc., Dominick Vitucci Truck Sales
d/b/a Dom's Truck Sales, Dominick Vitucci, Sr., and
Dominick Vitucci, Jr.

                              Defendants.

-------------------------------------------------------------------x

**PLAINTIFF SAMUEL GERALD** (hereinafter referred to as "Plaintiff"), by his

attorneys, Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York,

New York 10006, as and for his Complaint, alleges, upon knowledge with respect to himself, and

upon knowledge, information and belief as to all other matters, as follows:

1.      This is an action to remedy unlawful race discrimination, race-based hostile

environment, unwelcome racial harassment, and retaliation in violation of Title VII of the 1964

Civil Rights Act ("Title VII"), New York State Human Rights Law ("NYSHRL"), 42 USC §1981

and New York City Human Rights Law ("NYCHRL").

2.      Plaintiff seeks declaratory relief, monetary damages and punitive damages.

## PARTIES

3.      Plaintiff Samuel Gerald is a fifty-year-old Black male, and a self-taught, expertly

skilled worker in heavy machinery and repair and maintenance of heavy trucks.

4.      Plaintiff, at all relevant times herein, resided in the State of New York, Kings

County, Brooklyn, New York. Since the age of nine, and at all times relevant herein, Plaintiff was

an employee of Defendant Dom's Truck Sales.

1

5.     Defendant D.C.V. Holdings, Inc. (hereinafter ("Defendant DCV Holdings") is a corporation organized and existing under the laws of the State of New York, authorized to do business in the State of New York.

6.     Defendant Dominick Vitucci Truck Sales d/b/a Dom's Truck Sales (hereinafter "Defendant Dom's"), is a corporation organized and existing under the laws of the State of New York, authorized to do business in the State of New York. Upon information and belief, Defendant Dom's is located at 427 Euclid Avenue in Brooklyn, NY

7.     Defendant Dominick Vitucci, Sr. (hereinafter "Defendant Vitucci Sr."), is a white male. Upon information and belief, he does business at 427 Euclid Avenue, Brooklyn, NY, 11208. Upon information and belief, at all relevant times, Defendant Vitucci Sr. was Plaintiff's employer, and controlled the terms and conditions of his employment.

8.     Defendant Dominick Vitucci, Jr. (hereinafter "Defendant Vitucci Jr."), is a white male and the son of Defendant Vitucci Sr. Upon information and belief, at all relevant times, Defendants Vitucci Jr. was Plaintiff's employer, and controlled the terms and conditions of his employment.

9.     Upon information and belief, Defendants maintain their principal place of business in Brooklyn, New York, and all relevant events happened in Brooklyn, New York.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, 1343, 1981, 3729 and other relevant federal statutes. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

11.    Venue is proper in this case pursuant to 28 U.S.C. § 1391 because Defendant Dominick Vitucci Truck Sales d/b/a Dom's Truck Sales maintain their principle place of business in Brooklyn, Kings County, New York, which is in the Eastern District of New York. Furthermore, upon information and belief, the individual Defendants reside in Kings County.

## PROCEDURAL REQUIREMENTS AND PROCEDURAL HISTORY

12.    In or about June 2015, Plaintiff filed a charge with the EEOC.

13.    On or about August 10, 2017, Plaintiff received a Right to Sue Letter in connection to his EEOC Charge.

14.    Plaintiff commenced this action by filing a complaint in the United States District Court, Eastern District of New York on November 8, 2017. This action was commenced within 90 days of receipt of Plaintiff's Right to Sue letter.

## OVERVIEW

15.    Defendants turned Plaintiff into a Child Laborer when he was just nine years old. Defendants found a valuable worker at an incredibly cheap price, and they did what they could to hold Plaintiff hostage for the next forty years. Defendants used, abused and humiliated Plaintiff on a daily basis, while they subjected him to egregious racial discrimination and purposefully hamstrung his future, his hopes and his dreams in order to continue to enslave him. They threatened his life, forced him to drop out of high school and interfered with his ability to get a drivers' license - all so that he could never leave them, even though they paid him a fraction of what he was worth.

## STATEMENT OF THE FACTS
## INTRODUCTION
## Defendants Hire 9-Year-Old Plaintiff and his Younger Siblings as Child Laborers

16.    When Plaintiff was a child, he and his two younger brothers lived very close to Defendant Dom's Truck Sales (the "Yard"), which housed heavy machinery and commercial

3

trucks to be sold, repaired or scrapped for parts.

17.     In or about 1976, young Plaintiff and his even younger brothers were caught playing in a truck on Defendants' lot, which was not properly fenced in, even though it was extremely dangerous. Upon information and belief, neighborhood children regularly played in the dangerous lot.

18.     Plaintiff and his brothers were terrified to have been caught inside the truck yard. They feared they would be beaten, or that the police would be called and they would be sent to jail. The Defendants' employees who caught the children intentionally scared them, and took the petrified children to Defendant Vitucci Sr.

19.     Defendant Vitucci Sr. asked Plaintiff and his brothers how he could keep "Little Monkeys" off of his property. Ultimately, after scaring the children for some time, Defendant Vitucci Sr. announced that if he could not keep the "Little Monkeys" off of his property, he would just "put them to work."

20.     Although this first meeting with Defendant Vitucci Sr. occurred forty years ago, it has been seared into Plaintiff's memory because of the terror he felt and because it was one of the most important moments of his life. It is one of Plaintiff's formative memories.

21.     The children, relieved that they would not be punished, began to perform labor in Defendants' Yard, where they were severely overworked and underpaid, and always referred to as Little Monkeys and, later, other racial slurs.

22.     Plaintiff and his brothers came from an impoverished single parent household. Their father was absent from their lives, and they therefore lacked both a male role model and a second income to support them and their mother.

4

**Defendants' Subject the Children to a Racially Hostile Atmosphere**

23.     Right from the start, Defendant Vitucci Sr. subjected the children to racial harassment. He regularly continued to refer to Plaintiff and his two younger brothers as "Little Monkeys" or "Little Monkey Boys" to amuse other adults.

24.     Defendant Defendant Vitucci Sr. targeted Plaintiff and his siblings, who were mere children, for racial harassment, hostile work environment, discrimination and verbal abuse because of their race and skin color.

25.     Almost every day after they finished elementary school, Plaintiff and his brothers worked in the Yard from 3:00 pm until 9:00 pm.

26.     Plaintiff's principal duties included sweeping and mopping the floors, cleaning Defendant's office and running errands for Defendant Vitucci Sr.

27.     In effect, Plaintiff worked a full time job for Defendant Vitucci Sr., but was only paid $10.00 a week.

28.     Defendant Vitucci Sr. constantly told Plaintiff how lucky he was to work for him. Upon information and belief, Defendant Vitucci Sr. knew that Plaintiff and his brother had been abandoned by their father. Upon information and belief, Defendant Vitucci Sr. manipulated the children's desire for a father figure to, essentially, enslave them.

29.     On the weekly payday, Defendant Vitucci Sr. would ridicule Plaintiff by saying, "Come get your money, Little Monkey Boy!" and other similar racial slurs in front of his other employees. Defendant Vitucci Sr. would always laugh heartily at his own racist joke.

**Defendants Force Plaintiff and His Two Younger Brothers to Act Out the "Monkey Boy" Racial Stereotype for His Employees**

30.     Disturbingly, Defendant Vitucci Sr. also demanded that Plaintiff and his two younger brothers "entertain" him and his employees by acting out a racial stereotype, specifically,

5

he demanded Plaintiff and his brothers play-act as "Monkey Boys" by pulling on their ears and making faces.

**Defendants Regularly Harassed Plaintiff and His Brothers Because of their Race**

31.     Upon information and belief, Defendant Vitucci's wife, Carol Vitucci, now deceased, did not engage in racial harassment of the children, and in fact tried to protect them from her husband's abuse by telling them not to pay her husband any mind.

32.     However, upon information and belief, Defendant Vitucci Jr. unconditionally supported his father and likewise learned to dehumanize Plaintiff as a result of watching his father.

33.     As a child, Plaintiff confused Defendant Vitucci Sr., Carol Vitucci and Defendant Vitucci Jr. for a surrogate family. He was too young and isolated to recognize that they were using him for cheap labor, and that Defendants Vitucci Sr. and Vitucci Jr. were violently abusive and racist toward him.

**Defendant Vitucci Jr. Threatens and Dehumanizes Plaintiff by Carrying a Visible Handgun**

34.     When Plaintiff reached junior high school, he continued working afterschool in the Yard from 3:00 pm until 9:00 pm for $10.00 per week.

35.     Thereafter, Defendant Vitucci Sr., employed his son Defendant Vitucci Jr. to also work at the Yard. Defendant Vitucci Jr's main task seemed to be terrorizing Plaintiff, and he regularly lorded over Plaintiff.

36.     Defendant Vitucci Jr. had no skills in operating heavy machines and commercial trucks and was far less capable than Plaintiff.

37.     Nonetheless, Defendant Vitucci Jr. took it upon himself to personally police Plaintiff and every task that he performed.

6

38.     At all times, upon information and belief Defendant Vitucci Jr. carried a visible handgun holstered at his waist, which Defendant Vitucci Sr. apparently approved of.

39.     Upon information and belief, Defendant Vitucci Jr. regularly used the gun to intimidate Plaintiff and to keep Plaintiff in fear of him.

40.     Defendant Vitucci Jr. regularly reminded Plaintiff that he had power over Plaintiff and told Plaintiff that he would only have a job if Defendant Vitucci Jr. allowed him to have a job.

41.     Both Defendant Vitucci Sr. and Defendant Vitucci Jr. acted as if Plaintiff was a piece of property that they owned and could treat however they pleased.

42.     Plaintiff was very scared of Defendants, because throughout his childhood he repeatedly witnessed Defendant Vitucci Sr. and Defendant Vitucci Jr. scream at, abuse, threaten, harass, physically strike and/or assault other Black and Latino workers.

## Defendant Vitucci Jr. Renames Plaintiff "Black"

43.     As Plaintiff got older and grew larger, Defendants changed his name from "Little Monkey Boy" and simply started calling him "Black." For example, Defendant Vitucci Jr. would say, "Come over here, Black." Defendant Vitucci Jr. referred to Plaintiff as "Black" openly, notoriously and with the full blessing and amusement of Defendant Vitucci Sr.

44.     When Defendant Vitucci Jr. became angry with Plaintiff, as he often did, he regularly called Plaintiff, "Fucking Black Bastard."

## Plaintiff Develops a Great Aptitude for Machinery

45.     At or about the time Plaintiff entered junior high school, be began to teach himself how to drive, operate and repair the trucks and automobiles at the Yard. He discovered he had a natural aptitude for mechanics and was able to learn quickly.

46. Defendants took notice of Plaintiff's natural talent and growing skills, and they started to rely on him more and more. They now had a mechanic and driver who they knew would work for almost no pay. Defendants began to discourage Plaintiff from going to school, because "he couldn't make no money at school."

47. Plaintiff was proud of his mechanical and automotive skills and it made him proud and happy to be a good mechanic. He constantly strove to be more knowledgeable and was eager to learn all he could about the business.

48. Additionally, Plaintiff was still a preteen and maintained a childlike desire to please his father figure, Defendant Vitucci Sr., and the rest of his "surrogate family." Gaining their approval for his newfound skills was an incentive to work harder.

**Defendants Induce Plaintiff to Skip School to Work at the Yard**

49. Defendants came to heavily rely on Plaintiff for very cheap and efficient labor, and pressured him to work more and more hours. Defendant Vitucci Sr. regularly ordered Plaintiff to skip school to work at the Yard, and also began to induce Plaintiff to drop out of school entirely.

50. Defendant Vitucci Sr. constantly told Plaintiff that he "couldn't make no money going to school" and that "nothing good comes from [going to school.]"

51. Defendant Vitucci Sr. threatened to fire Plaintiff if he did not leave school early school to work more hours. Ultimately, he did induce adolescent Plaintiff to begin skipping school at noon every day.

**When Plaintiff Reached the 10th Grade, Defendant Vitucci Sr. Convinced Him to Drop Out of High School**

52. As Plaintiff got older and became an even more experienced and valuable worker, Defendant Vitucci Sr. began to fiercely pressure Plaintiff to drop out of high school entirely. It was clear that Defendant Vitucci Sr. did not want to lose the expert mechanic who worked for next

8

to nothing. Upon information and belief, Defendant Vitucci Sr. not only wanted Plaintiff leave school so he could work more hours, but also did not want Plaintiff to be exposed to new people and ideas. Upon information and belief, Defendant Vitucci Sr. wanted to maintain the same amount of control he had over Plaintiff so that he could continue exploiting him.

53.     Plaintiff was afraid that he would not be allowed to work for Defendants at all if he did not do as Defendant Vitucci Sr. said. Despite the violence, threats and verbal abuse, Plaintiff continued to see Defendants as a surrogate family and the Yard as his home. Moreover, his family background and poverty made him a perfect target for exploitation. Even Plaintiff's meager income made a difference at home, given how his family struggled to make ends meet.

54.     Plaintiff agreed to drop out of school in the tenth grade and began working for the Defendants full time.

55.     Though Plaintiff routinely worked 58, and sometimes up to 70, hours per week after dropping out of high school, Plaintiff's pay was increased to just $100 a week.

56.     Upon information and belief, because Plaintiff was Black, Defendant Vitucci Sr. did not care that he was encouraging Plaintiff to foreclose educational, social, and future financial opportunities by inducing Plaintiff to skip school to work for Defendants.

57.     Furthermore, upon information and belief, Defendant Vitucci Sr. knew that Plaintiff was very young, impressionable and saw Defendant Vitucci Sr. as an authoritative father-like figure. Upon information and belief, Defendant Vitucci took advantage of Plaintiff's youthful innocence and desire for a male role model, knowing that Plaintiff was an extremely low cost, highly skilled source of labor that he could exploit for personal gain.

58.     Carol Vitucci privately advised Plaintiff that, "[Defendant Vitucci Sr.,] doesn't care about anyone except himself. You do what you have to do."

59.     Upon information and belief, when Carol Vitucci advised Plaintiff, it added to his confusion about whether the Vitucci family actually cared about him and his best interests. He loved Carol Vitucci and, upon information and belief, it was evident that she actually did care for him. However, he was wrong to assume that their positive relationship meant that Defendants Vitucci Sr. and Vitucci Jr. also considered him like family.

60.     Plaintiff did, in fact, see Defendant Vitucci Sr. as a surrogate father, even if an abusive one, and therefore trusted that Defendant Vitucci Sr. was providing guidance from the perspective of a caring parental figure. Plaintiff earnestly wanted to believe that Defendant Vitucci Sr. and his family cared for him, so he was an easy target for manipulation by the older man. Plaintiff came to believe that if Defendant Vitucci Sr. gave him "advice" about his future and "allowed" him to work at the truck yard, it meant that he actually did care for Plaintiff, despite the racial slurs he and Defendant Vitucci Jr. subjected him to on a daily basis.

61.     Plaintiff did not have the experience or sophistication to understand that Defendant Vitucci Sr. was a racist who had a personal financial interest in Plaintiff cutting school, and that to Defendant Vitucci Sr., Plaintiff was merely cheap child labor.

**Defendant Vitucci Jr. Relentlessly Harasses Plaintiff and Calls Him "Black Motherfucker"**

62.     Upon information and belief, the more that Plaintiff excelled as a mechanic and Defendant Vitucci Sr. began to rely on Plaintiff in the truck yard, the more Defendant Vitucci Jr. resented him. Throughout Plaintiff's later teenage years, Defendant Vitucci Jr. began harassing and yelling at Plaintiff even more than ever, and took to calling him "Black Motherfucker" even in front of customers. Plaintiff fully understood the racist and abusive meaning of these words, and was humiliated and wounded by Defendant Vitucci Jr.'s behavior.

## Defendant Vitucci Jr. Threatens to Kill Plaintiff.

63.     After years of racist abuse, Plaintiff finally told Defendant Vitucci Jr. "Stop calling me a Black Motherfucker."

64.     Immediately, Defendant Vitucci Jr. pulled the gun from his waist, pointed it directly at Plaintiff and said, "I will blow your fucking head off – I moved up."

65.     After that encounter, Plaintiff naturally feared for his life. Plaintiff felt powerless against Defendant Vitucci Jr., so Plaintiff avoided him whenever he could and accepted the racially offensive, degrading and humiliating name calling for fear of his personal safety.

## Defendants Continue to Subject Plaintiff to Racist Abuse

66.     Everyday Plaintiff was subjected to racial slurs and taunts from Defendant Vitucci Sr. and Defendant Vitucci Jr.

67.     Plaintiff continued to be subjected to racial slurs and taunts from Defendant Vitucci Sr. and Defendant Vitucci Jr. every day.

68.     Now that Plaintiff was a teenager, Defendant Vitucci Sr would regularly call him a "Nigger," "a piece of shit," or a "Fucking Mutt." Plaintiff became resigned to the racially derogatory name-calling and tried his best to ignore it. As a coping mechanism, teenage Plaintiff began to justify Defendants use of these slurs; Plaintiff desperately wanted to believe that Defendant Vitucci Sr. cared about him and didn't really mean what he was saying.

69.     By that time, Plaintiff was trapped in a cycle of abuse and servitude, where he was required to work in a racially hostile work environment under dangerous conditions at an incredibly below market rate of pay.

70.     However, Plaintiff saw no choice but to stay and work for Defendants. He was afraid of Defendant Vitucci Jr., and worried that Defendant Vitucci Jr. might become violent again.

11

He felt indebted to his father figure Defendant Vitucci Sr. for "allowing" him to work and still persisted in the belief that Defendant Vitucci Sr. cared about him.

71.     Further, once Plaintiff left school, he was isolated from other young people and had no other adult role models. He had no one to help him see that there were other options, and that with his mechanic skills he could have a career outside Dom's Truck Sales.

72.     Additionally, Plaintiff needed the money for his family and felt he had to accept the Defendants' racist abuse in order to keep earning money.

**Defendants Interfere With Plaintiff's Ability to Get a License**

73.     After Plaintiff dropped out of high school, Plaintiff was required to work Monday through Saturday from 9:00 AM until 9:00 PM, six days a week and occasionally even on Sunday to satisfy Defendants' demands. Plaintiff was never given a vacation or any time off at all until 2013, when he was finally allowed to take a short, unpaid vacation. This was the only vacation that he was ever given while he was employed at Defendants for more than 35 years.

74.     Despite that Plaintiff had already been taught how to drive commercial trucks and other vehicles as a child, and was regularly required by the Defendants to drive their vehicles as an underaged, unlicensed child, Plaintiff was thrilled to finally be old enough to get his driver's license.

75.     However, when Plaintiff asked for time off to take his driving test, instead of happily agreeing to do so, Defendant Vitucci Sr. became angry and flatly refused to give him the time off to take the test. In fact, as he often did, Defendant Vitucci Sr. threatened to fire Plaintiff if he dared take time off.

76.     Upon information and belief, Defendant Vitucci Sr. recognized that Plaintiff, with his many years of experience and natural mechanic ability, could easily go work for someone else

if he had a driver's license - and that he would be paid far more than Defendants paid him.

77.    At this point, ironically, Plaintiff was a highly experienced driver of commercial vehicles and, upon information and belief, likely would have easily passed the licensing test.

78.    Despite refusing to give Plaintiff time to take and pass his driving test, Defendant Vitucci Sr. knowingly continued to demand that the unlicensed Plaintiff drive commercial trucks and other vehicles as part of his employment, including on public roads and highways.

79.    Once again, Plaintiff did as he was told in order to avoid Defendants' wrath and keep his job.

80.    Plaintiff was thereafter caught driving without a license and ultimately racked up numerous expensive tickets that he could not afford to pay.

81.    When Plaintiff brought the tickets to Defendant Vitucci Sr., he was assured that Defendants' lawyer or Defendant Vitucci Jr. would "take care of it."

82.    Upon information and belief, Defendants never "took care of" the tickets Plaintiff incurred while driving for them. Plaintiff is currently unable to get a driver's license because he cannot afford to pay off the many fines he incurred while working for the Defendants.

83.    Upon information and belief, Defendants intentionally interfered with Plaintiff's efforts to obtain a driver's license so that he would remain dependent on them and would not be able to find a job working for anyone else.

**Plaintiff is Jailed, and Thereafter is Further Beholden to Defendants**

84.    In his early 20s, Plaintiff served time in prison. Upon his release from prison, he returned to work for Defendants. Upon information and belief, Defendants used Plaintiff's criminal record as another means to manipulate him, telling him that he would never be able to

find work elsewhere because they were the only people who would hire a "Black criminal" like him and constantly made him feel he should be grateful that they allowed him to work there at all.

### Plaintiff's Pay is Raised to $250 a Week for 70 to 80 Hours

85.     Finally, when he was approximately 23 years old, Plaintiff was given "a raise" to just $250 a week. Defendants' pay was still not in compliance with the wage and hour laws, and Defendants paid Plaintiff under the table.

86.     Upon information and belief, non-Black employees were paid far more.

### Defendants Expose Plaintiff to Dangerous, Illegal Conditions

87.     Throughout Plaintiff's employment, Defendants regularly required Plaintiff to engage in dangerous work without the necessary safety equipment. Upon information and belief, Plaintiff and another African-American employee were regularly forced to do the most perilous and repulsive jobs at the truck yard. For example, Plaintiff was forced to work on heights without a safety harness. Plaintiff was forced to sandblast and use air compressors without the proper breathing equipment. He was forced to conduct mechanic's work in the same unventilated room where trucks were being painted. He was forced to climb into garbage truck compactors to remove trash, dodging hazardous waste like syringes and baby diapers without safety equipment.

### Defendants Threaten Plaintiff's Life When He Asks for a Raise

88.     In or about 1995, when Plaintiff was 28 years old, he finally summoned the courage to ask Defendants to pay him a fair wage, including overtime, and also asked for an annual vacation. Plaintiff had finally learned that, especially for his level of mechanical skill and expertise, he should be making far more than what Defendants paid.

89.     Upon information and belief, Defendant Vitucci Sr. became uncontrollably outraged by Plaintiff's request and called Plaintiff a "Stupid Nigger," "Black Motherfucker" and

"ungrateful piece of shit."

90. During his tirade, Defendant Vitucci Sr. began talking about Plaintiff's wife, stating, "Why is your wife sitting on her fat Black ass and you are here asking me for a raise?"

91. Plaintiff immediately objected to Defendant's use of racial slurs against his wife.

92. In response to Plaintiff's objections, Defendant Vitucci Jr. pulled his gun out and pointed it directly at Plaintiff's head.

93. With the gun pointed at his head, Defendant Vitucci Sr., who was, upon information and belief, outraged that a Black man had "talked back to him" screamed, "I WILL HAVE MY SON PUT A BULLET IN YOUR HEAD, NIGGER."

94. Plaintiff was shocked and terrified, and feared for his life. He immediately apologized and told Defendants that his request was wrong and ungrateful.

95. Unsurprisingly, Plaintiff was not given a vacation or a raise after this incident.

### The Racial Hostility Increases

96. After successfully using threats of violence to browbeat Plaintiff in the incident described above, upon information and belief, Defendants Vitucci Sr. and Vitucci Jr. were emboldened to escalate their racist abuse of Plaintiff.

97. Defendant Vitucci Sr. frequently berated Plaintiff and resumed calling him "Nigger," while Defendant Vitucci Jr. called Plaintiff "Black Motherfucker."

98. After threatening his life, Defendant Vitucci Jr. ominously referred to Plaintiff as "Black" on a regular basis, by nastily saying such things as, "Come here, Black," "Go [do this], Black," "Get out of here, Black" and "Who asked you, Black."

99. When machinery broke down at the yard, Defendant Vitucci Sr. grabbed a stick and threatened Plaintiff, "I WILL SMACK YOU UPSIDE YOUR BLACK HEAD!"

100.     Additionally, Defendant Vitucci Sr. began to ask Plaintiff racist and offensive rhetorical questions such as, "Why do Niggers buy Cadillacs but can't afford no gas for it?" and, "why do Black girls get babies and get on welfare?"

101.     Upon information and belief, Defendant Vitucci Sr. and Defendant Vitucci Jr. created an atmosphere of constant intimidation under which Plaintiff had no choice but to endure the racial harassment and verbal abuse. Defendants chilled any possibility of Plaintiff's objection to their constant racial harassment by threatening physical harm against Plaintiff, and even threating his life.

### Plaintiff Suffers High Blood Pressure as a Result of the Abuse

102.     By 2005, the now 38-year-old Plaintiff was overwhelmed by the constant racial harassment and physical intimidation that he was subjected to on a daily basis.

103.     Additionally, Defendants placed an undue amount of pressure on Plaintiff to perform his job duties at an impossibly fast rate, though they did not place the same pressure on similarly situated Latino or white employees.

104.     Further, only Plaintiff was forced to work from 9:00 in the morning until 9:00 in the evening, 6 days a week and occasionally even on Sunday to satisfy the Defendants' demands.

105.     Defendants' abuse of Plaintiff was so brazen that even customers informed Plaintiff that the way he was being treated was illegal and that he should not allow himself to be treated like a slave.

106.     Sometimes Plaintiff would become overwhelmed by the abuse and actually break down into tears.

107.     Plaintiff began drinking alcohol every night to escape from the daily, mounting psychological stress of working under Defendants' constant verbal abuse, race discrimination and

threats of violence.

**Defendants Attack Plaintiff After President Obama is Elected**

108.    Following the election of President Barack Obama in 2008, Defendant Vitucci Sr. became even more hateful towards Plaintiff and to Black people in general. He regularly referred to President Obama as "That Black Motherfucker."

109.    After President Obama was elected, Defendant Vitucci Sr. asked Plaintiff if he was "happy now." When Plaintiff didn't respond, Defendant asked Plaintiff, "do you feel good there's a Nigger in office now?"

110.    Plaintiff did his best to avoid discussing politics and President Obama with Defendants, but there were times when they would seek him out and he could not avoid listening to their racist tirades.

111.    At this time, Plaintiff was in his 40s and had come to expect Defendants' racist comments toward him. After the incident wherein Defendants threatened him at gunpoint, he felt powerless to object to the abuse and racism. However, hearing Defendant Vitucci Sr. speak this way about the President made Plaintiff feel even more hopeless.

**Defendant Vitucci Sr. Interferes With Plaintiff's Opportunity to Get a Driver's License**

112.    In 2013, Plaintiff set a goal to obtain a commercial drivers' license for the good of himself and his family. Realizing that Defendants would likely never pay the tickets he had accumulated on their watch, Plaintiff saved up enough to pay off the $3,500.00 worth of driving tickets he had accumulated while driving for Defendants.

113.    Plaintiff then calmly and quietly informed Defendant Vitucci Sr. that he would not be able to drive commercial trucks without a license for the following year, because he needed to have a clean driving record for one year so that he could sit for the exam.

114. Defendant Vitucci Sr. flew into a rage and ultimately demanded that Plaintiff go and pick up an oil truck for him in Maspeth, Queens or be fired.

115. Upon information and belief, Defendant Vitucci Sr. knew that once Plaintiff acquired his license to drive commercial vehicles he would no longer be dependent on Defendants for his job. Upon information and belief, Plaintiff was a valuable asset to Defendants – he worked for cheap, was afraid to complain, and he was highly skilled.

116. Plaintiff explained to Defendant Vitucci Sr. that he could not pick up the truck because he could not risk getting a ticket for driving without a commercial driver's license, and reminded him that he just finished paying of thousands of dollars in tickets.

117. Defendant Vitucci Sr. continued to scream at Plaintiff shouting, "WHAT THE FUCK! WHY DO I NEED YOU HERE, IF YOU CAN'T DO WHAT I TELL YOU TO DO?"

118. Defendant Vitucci Sr.'s threat placed Plaintiff in an impossible situation. Plaintiff had just spent his savings on paying off the tickets, so his family had no safety net if he was fired. He would likely not be able to get another job until he had a valid driver's license. He also felt physically afraid of Defendants, since they had violently threatened him in the past and since he had witnessed them beat other minority employees.

119. Plaintiff bowed to the pressure and agreed to pick up the oil truck in Queens. As Defendant was likely well aware, the truck had a broken headlight and no front seat belt. This made it extremely likely that Plaintiff would be pulled over and cited for driving without a license.

120. Unsurprisingly, Plaintiff was stopped by a police officer and issued multiple tickets, including tickets for driving with a broken headlight; driving with no front seat belt; and being on a road that was "out of route," meaning the oil truck was too large for that particular road.

121.     Plaintiff was extremely disappointed that because of Defendant he had just lost the opportunity to finally be licensed to drive. Saving up $3,500 had been a huge undertaking for him and his family, and he had been proud that he finally accomplished it. Now, because of Defendants, it had all been for nothing.

122.     When Plaintiff complained to Defendant Vitucci Sr. about the truck's unsafe, unlawful condition and the resulting driving tickets, he told Plaintiff that his lawyer would take care of it. Upon information and belief, Defendant Vitucci Sr. never made any attempt to help Plaintiff pay for the tickets.

123.     Upon information and belief, Defendant knew that as long as Plaintiff did not have a driving license and was buried in driving tickets, Plaintiff would be dependent on Defendants for his job.

124.     Defendant was right, Plaintiff was dependent on Defendants for his job and thus, had no choice but to continue to be subjected to the racially hostile and unhuman conditions he was subjected to.

**In December of 2014, Plaintiff Asks for a Raise or Says He Will Have to Move**

125.     By December of 2014, Plaintiff, who had a wife and family at this point, found it increasingly difficult to afford the rising cost of living in New York. The deep sense of responsibility Plaintiff felt to his family helped embolden him to confront Defendants about his meager pay and arduous schedule.

126.     Plaintiff finally worked up the courage to tell Defendant Vitucci Sr. that he really needed a raise or he would have to think about leaving New York entirely to afford a better life.

127.     He also told Defendant Vitucci Sr. that he needed vacation time like other employees to spend with his family.

128.    Defendant Vitucci Sr. brushed Plaintiff off, saying that they would discuss it at a later time.

**Plaintiff is Subjected to Racist Abuse for Requesting a Raise**

129.    Following his request for a raise and a vacation, Defendant Vitucci Sr. began constantly telling Plaintiff that "Black people are lazy," and asking him, "Why are Black people so lazy and ungrateful?"

130.    When Plaintiff refused to engage Defendant Vitucci Sr. by answering his racist questions, Defendant Vitucci Sr. upped the hostility and racial abuse by repeatedly stating, "Niggers are lazy" whenever Plaintiff was in ear shot.

131.    When Plaintiff still made no response, Defendant Vitucci Sr. began threatening that "I am not going to hire no more Niggers, I am only going to hire Mexicans, and Mexicans are cheaper."

**In or About February of 2015, Plaintiff is Sent Home When He Again Asks for a Raise and Vacation**

132.    Approximately a month after his first request, Plaintiff again told Defendant Vitucci Sr. that he would have to leave New York to live somewhere more affordable if he was not able to earn higher pay and spend more time with his family.

133.    Even though he had been treated so disgustingly by Defendants, Plaintiff felt it was the right thing to do to give Defendant Vitucci Sr. six months' notice. Plaintiff had, over time, become a central figure at Dom's Truck Sales, essentially running the Yard on a day to day basis. He felt a sense of responsibility to allow Defendants to find a replacement before he moved.

134.    Additionally, Plaintiff still harbored a tiny hope that Defendant Vitucci Sr. might change his way when faced with losing Plaintiff as an employee and surrogate son.

135. That hope was dashed when Plaintiff told Defendant Vitucci Sr. that he was considering leaving and Defendant Vitucci Sr. angrily growled, "Nigger, I own you."

136. Defendant Vitucci Sr. further screamed, "Get out of here. Don't come back for a week."

137. Plaintiff was forced to go on leave for a week without pay and did not know if he would have a job to return to. Plaintiff and his family desperately needed his income. Although he had discussed moving out of New York, they had not yet saved enough for moving costs.

**Plaintiff Realizes that He Must Leave Dom's Truck Sales and Move Out of New York**

138. At or about the same time, Plaintiff learned that a close family member was ill. Plaintiff was devastated by the news. It forced him to realize that life was too short to subject himself to Defendants' hideous treatment.

139. Plaintiff finally began to clearly see that Defendants did not care about him the way that he hoped that they did, and that they would continue to use and abuse him as long as he worked at Defendants.

140. Plaintiff was also extremely upset about the outstanding tickets, which, despite Defendants' promises, had still not been resolved.

**Plaintiff is Terminated for "Lack of Work" When He Again Asks for a Raise and Vacation**

141. Plaintiff returned to work on or about February 9, 2015. At the end of the day, he again asked Defendant Vitucci Sr. for a raise and vacation Defendant Vitucci Sr. again brushed him off, saying, "I will talk to you another time."

142. When Plaintiff arrived at work the next day, February 10, 2015, it was obvious that Defendant Vitucci Sr. was extremely angry. He ordered Plaintiff to complete a number of tasks, and then directed him to the office, where Carol Vitucci was waiting for him.

21

143.    Carol Vitucci told Plaintiff that Defendant Vitucci Sr. had instructed her to tell Plaintiff that they were short on work and that Defendants "had to let him go."

144.    Plaintiff walked back to the shop to speak to Defendant Vitucci Sr. and say goodbye. Defendant Vitucci Sr. immediately began screaming and yelling at Plaintiff.

145.    Overwhelmed by Defendant Vitucci Sr.'s furious outburst, Plaintiff replied "If you don't *want* me to leave, you have to pay me fairly."

146.    Defendant Vitucci Sr. screamed, "YOU'LL ONLY GET THE FUCKING SWEAT FROM MY BALLS."

147.    After witnessing Defendant Vitucci Sr.'s angry tirade, Plaintiff left the premises and returned to his home.

**Defendant Vitucci Sr. Further Attacks Plaintiff When He Returns for his Belongings**

148.    On February 12, 2015, Plaintiff's wife and teenage son drove with him to retrieve his belongings from Dom's Truck Sales.

149.    When Defendant Vitucci Sr. saw Plaintiff he began to scream and call Plaintiff deragatory names. At one point, Defendant Vitucci Sr. yelled, "WHEN YOU CRAWL BACK [TO ME] IN THE MUD, I WON'T LET YOU CLEAN THE SHIT FROM MY SHOES, YOU ARE NOTHING BUT A TWO BIT NIGGER."

150.    Plaintiff became very afraid because Defendant Vitucci Sr. was so angry and he returned to his wife's car.

151.    Defendant Vitucci Sr. ran out after him, and, in front of Plaintiff's wife, his teenage son, and several of his co-workers, screamed, "YOU AIN'T FUCKING LEAVING YET – YOU FUCKING BASTARD."

152.    Shocked and horrified, Plaintiff's wife objected to Defendant Vitucci Sr.'s verbal

custom and/or policy of discrimination.

161.    By reason of Defendants' repeated violations of Plaintiff's statutory and constitutional rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment.

162.    As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

163.    Plaintiff was discriminated against and subjected to race and color discrimination that created a hostile work environment by Defendants based on his race and/or skin color in violation of § 1981 of the United States Code, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 the New York State Human Rights Law, and the New York City Human Rights Law. As a result of Defendants' violation, Plaintiff has been damaged in an amount to be determined by a Jury.

### AS AND FOR A SECOND CAUSE OF ACTION
*(Retaliation in Violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law)*

164.    Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if set forth herein.

165.    As set forth in detail above, Defendants subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions because of his color and race in violation of Plaintiff's statutory and constitutional rights. Plaintiff

repeatedly complained to Defendants and/or Defendants' policymakers who themselves regularly witnessed the severe and pervasive race and color discrimination and hostile work environment he was subjected to during his employment with Defendants.

166.    Plaintiff notified Defendants of the severe race, color and gender discrimination and hostile work environment he was subjected to and protested the harassment and the fact that Defendants failed to act responsively.

167.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

168.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of gender, race, and color discrimination and a hostile work environment.

169.    Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of his employment.

170.    The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

171.    Because Defendants feared that he would report the unlawful behavior that he protested, Defendants terminated Plaintiff's employment, and following his termination, intentionally failed to hire Plaintiff for several positions in further retaliation.

172.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory termination.

173.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose

substantial income including, but not limited to: wages, social security, and other benefits due him.

174.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

175.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

176.    Based on the foregoing, Plaintiff was retaliated against and suffered a retaliatory termination by Defendants in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 the New York State Human Rights Law, and the New York City Human Rights Law. As a result of Defendants' retaliatory actions, Plaintiff has been damaged in an amount to be determined by a Jury.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial;

(ii)   On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial;

(iii)   Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' fees, together with such other and further relief as this court deems equitable,

proper, and just.

Dated: New York, New York
        November 8, 2017

                                GODDARD LAW PLLC
                                *Attorneys for Plaintiff*

                                By: _Megan Goddard_
                                    Megan S. Goddard, Esq.
                                39 Broadway, Suite 15640
                                New York, NY 10006
                                Tel: 646-504-8363
                                Fax: 212-473-8705

To:     D.C.V. Holdings, Inc.
        Dominick Vitucci Truck Sales d/b/a Dom's Truck Sales
        Dominick Vitucci, Sr.
        Dominick Vitucci, Jr.